USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _6/17/24___

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

FIANA KWASNIK,                                    :

                                  Plaintiff,      :

                  -against-                       :            22-CV-4767 (VEC)

OXFORD HEALTH INSURANCE, INC.,                    :            <u>OPINION & ORDER</u>

                                  Defendant.      :

-------------------------------------------------------------X

VALERIE CAPRONI, United States District Judge:

       Plaintiff Fiana Kwasnik brings this action under Section 502(a)(1)(B) of the Employee

Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), alleging that

she was wrongfully denied benefits by Defendant Oxford Health Insurance, Inc. ("Oxford").

The parties have cross-moved for summary judgment. *See* Dkts. 99, 105. Because the medical

services Plaintiff wanted Oxford to cover were not medically necessary, Oxford's motion for

summary judgment is GRANTED, and Plaintiff's motion for summary judgment is DENIED.

## I.    BACKGROUND[1]

### A.  Facts

       Plaintiff was a participant in a group medical insurance plan (the "Plan") issued by

Oxford and provided through her employer. 56.1 Stmt. ¶ 1, Dkt. 102. In September 2021,

---

[1]       The facts are gathered from the parties' 56.1 statement, the exhibits attached to the parties' submissions, and the parties' summary judgment briefs. The facts are construed in the light most favorable to the non-moving party. *See Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 30 (2d Cir. 2018). All facts are undisputed unless otherwise indicated. The Court will refer to the relevant submissions as follows: Oxford's memorandum of law in support of its motion for summary judgment, Dkt. 101, as "Oxford Mem."; Plaintiff's memorandum of law in support of her motion for summary judgment, Dkt. 105, as "Kwasnik Mem."; Oxford's memorandum of law in opposition to Kwasnik's motion, Dkt. 106, as "Oxford Opp."; and Plaintiff's memorandum of law in opposition to Oxford's motion for summary judgment, Dkt. 107, as "Kwasnik Opp." The parties' 56.1 Statement, Dkt. 102, is cited as "56.1 Stmt." Citations to the "Stalinski Decl." refer to the exhibits attached to the Declaration of Jane Stalinski at Dkt. 100.

Plaintiff sought coverage for a number of procedures in her efforts to get pregnant.  *Id.* ¶¶ 17, 78.

Plaintiff sought coverage for the following procedures: (i) fertilization of oocytes that had been

retrieved at Plaintiff's expense in 2017 ("2017 oocytes")[2]; (ii) an oocyte retrieval ("2021

oocytes"); (iii) fertilization of all of the oocytes from 2017 and the requested 2021 retrieval by

intracytoplasmic sperm injection ("ICSI"); and (iv) genetic testing (referred to as "PGT-A

testing") of any resulting embryos.  *Id.* ¶¶ 79–80.  The dispute is over which, if any, of the

requested services were "medically necessary" and covered by the Plan.

### 1.  Plan Terms

The Plan covers only "Covered Services."  Stalinski Decl. Ex. A (the "Plan") at 46 [47],

Dkt. 100–1.[3]  "Covered Services" are defined as the "Medically Necessary services paid for or

arranged . . . by [Oxford] under the terms and conditions of this Certificate."  *Id.* at 41 [42], 46–

47 [47–48].  "The fact that a Provider has furnished, prescribed, ordered, recommended, or

approved [a] service does not make it Medically Necessary . . . ."  *Id.* at 47 [48].

As is relevant here, services are considered by the Plan to be Medically Necessary if:

- They are clinically appropriate in terms of type, frequency, extent, site, and duration, and considered effective for [the insured's] illness, injury, or disease;
- They are required for the direct care and treatment or management of that condition;
- They are provided in accordance with generally-accepted standards of medical practice.

*Id.* at 47 [48].  Oxford may base its determination of Medical Necessity on:

- [The insured's] medical records;
- [Oxford's] medical policies and clinical guidelines;
- Medical opinions of a professional society, peer review committee or other groups of Physicians;

---

[2]     Plaintiff was not insured by the Plan at that time.  56.1 Stmt. ¶ 1.

[3]     Consistent with the protocol used by the parties, the Court will cite to Exhibits A and B of the Stalinski Declaration using the Bates Stamp numbers on the bottom right of the page.  The number in brackets following that page number is the page of the pdf that corresponds to the Bates Stamp page number.

- Reports in peer-reviewed medical literature;
- Reports and guidelines published by nationally-recognized health care organizations that include supporting scientific data;
- Professional standards of safety and effectiveness, which are generally-recognized in the United States for diagnosis, care, or treatment;
- The opinion of Health Care Professionals in the generally-recognized health specialty involved;
- The opinion of the attending Providers [].[4]

*Id*. Oxford's process for determining whether services are medically necessary is referred to as "Utilization Review." *Id*. at 95 [96]. Oxford does not "compensate or provide financial incentives to [its] employees or reviewers for determining that services are not Medically Necessary." *Id*.

Section IX (J)(3) of the Plan pertains to "Advanced Infertility Services" and provides coverage for "[t]hree (3) cycles per lifetime of in vitro fertilization [and] [c]ryopreservation and storage of embryos in connection with in vitro fertilization." *Id*. at 69 [70]. An in vitro fertilization ("IVF") cycle includes "all treatment that starts when: preparatory medications are administered for ovarian stimulation for oocyte retrieval with the intent of undergoing in vitro fertilization using a fresh embryo transfer, or medications are administered for endometrial preparation with the intent of undergoing in vitro fertilization using a frozen embryo transfer." *Id*. The Plan does not cover "[m]edical and surgical procedures that are experimental or investigational unless [Oxford's] denial is overturned by an External Appeal Agent." *Id*.

The Plan provides two levels of internal administrative appeal of an adverse benefit determination, with the second level appeal being voluntary; the Plan also provides a voluntary external appeal. *Id*. at 100–01 [101–02]. If the Plan participant appeals a final adverse

---

[4]    The Plan makes clear that the opinion of the treating provider will be considered but is not conclusive.

determination to an External Appeal Agent,[5] the External Appeal Agent's decision is "binding" on Oxford and the Plan member. *Id*. at 103 [104], 106 [107].

## 2.   Oxford's Responses to Plaintiff's Requested Services

The history of Plaintiff's requests and Oxford's responses is convoluted and confusing because numerous services were at issue and because the appeals of adverse decisions often overlapped and, at times, appear to have proceeded on multiple parallel tracks simultaneously. Despite the muddled history, Plaintiff is challenging denials of coverage for: a round of oocyte retrieval, fertilization by ICSI, and PGT-A testing. The Court will separately discuss the decision making and appeal process for each.

### i.   An IVF Cycle

In September 2021, Plaintiff sought pre-authorization from the Plan to undergo a full IVF cycle. 56.1 Stmt. ¶ 17. This request was made in tandem with a request for thawing and fertilization of oocytes that had been retrieved in 2017 but not fertilized.[6] *Id*. The request for a full IVF cycle was denied on September 22, 2021 by Dr. Monique May, an Oxford Medical Director. Dr. May noted that Plaintiff had frozen embryos or oocytes available for use (*i.e.*, the oocytes retrieved in 2017) and denied authorization because retrieving additional oocytes was not "medically necessary." 56.1 Stmt. ¶ 18.[7]

---

[5]    An "External Appeal Agent" is an independent third party who has been certified by the New York State Department of Financial Services ("DFS") to conduct these appeals. *Id*. at 105 [106].

[6]    On September 22, 2021, Dr. Monique May, an Oxford Medical Director, issued an initial adverse benefit determination for thawing and fertilization of the 2017 oocytes because the requested treatment was not "medically necessary." 56.1 Stmt. ¶ 18. Plaintiff successfully appealed that decision. *Id*. ¶ 134. On November 17, 2021, the Plan notified Plaintiff that it would cover thawing the 2017 oocytes, fertilization, and intrauterine transfer of any embryos that resulted. *Id*. ¶ 138. That decision was reiterated in December by Dr. Patricia Naughton and Dr. Steven Palmer, Oxford Medical Directors. Stalinski Decl. Ex. B at 1201[1040] and 881–82 [719–20], Dkt. 100–2.

[7]    Dr. May's determination was based on Oxford's Infertility Clinical Policy and Oxford's Preimplantation Genetic Testing Clinical Policy. 56.1 Stmt. ¶ 100. Those guidelines provide that "[f]resh oocyte retrievals are not indicated when previously frozen oocytes (M2) or embryos of at least BB grading quality (or equivalent) are

In October 2021, Plaintiff's treating physician, Dr. Stephen Spandorfer, spoke to Dr. Amy Ryan, another Oxford Medical Director, regarding Plaintiff's treatment plan. *Id*. ¶ 21.  Dr. Ryan reviewed the Plan's infertility coverage with Dr. Spandorfer and explained that the requested IVF cycle was not a covered benefit under the Plan. *Id*. ¶ 22.

On October 18, 2021, Plaintiff appealed Oxford's decision to deny coverage for a new IVF cycle.  *Id*. ¶ 23.  Plaintiff argued that New York law mandates ("the Mandate") health insurance plans to cover three rounds of IVF, that the 2017 oocytes had been retrieved and preserved at her own expense, and that she had not completed an IVF round in 2017.  56.1 Stmt. ¶¶ 114–15.

On November 2, 2021, Dr. Patricia Naughton, an Oxford Medical Director specializing in obstetrics and gynecology, upheld the adverse decision.  56.1 Stmt. ¶ 24.  Because Plaintiff had nine oocytes that had been frozen in 2017 and were available for use, Dr. Naughton determined that "[a]dditional IVF cycles are not medically necessary."  *Id*. ¶ 25.

Plaintiff appealed Dr. Naughton's decision, arguing erroneously that Oxford had denied coverage for an entire IVF cycle because she had requested genetic testing.  Stalinski Decl. Ex. B at 772 [610], Dkt. 100–2.  Plaintiff supplemented her position on December 1, 2021.  *Id*. at 1090 [929].  At that time, she professed not to understand Oxford's basis for denying coverage for an IVF cycle, but she acknowledged that "it appears the basis for denial is that [she] electively froze [her] eggs in 2017 before [being insured by Oxford] and . . . must use those eggs before [she] can receive coverage."  *Id*.

On December 10, 2021, Dr. Steven Palmer upheld the denial of coverage for a fresh IVF cycle.  56.1 Stmt. ¶¶ 34–36.  Dr. Palmer noted that a fresh IVF cycle was not medically

---

available for transfer and if tested, are genetically normal."  56.1 Stmt. ¶ 20.  (Optum and Oxford are subsidiaries of UnitedHealth Group Incorporated.  Oxford Mem. at 7 n.4, Dkt. 101.)

necessary because Plaintiff already had "eggs that were frozen in or around 2017," and that Oxford does not approve "for fresh IVF cycles if there are frozen eggs or embryos available." Stalinski Decl. Ex. B at 881–82 [719–20].

On December 22, 2021, Plaintiff requested a voluntary external review through the New York State Department of Financial Services ("DFS") of Oxford's refusal to cover, *inter alia*, an IVF cycle.[8]  56.1 Stmt. ¶ 44.  DFS assigned Plaintiff's case to Island Peer Review Organization, Inc. ("IPRO") for external review.  *Id.* ¶ 176.  On January 27, 2022, Dr. Monty Bodenheimer, the IPRO Medical Director who is board certified in obstetrics and gynecology and reproductive endocrinology, upheld the decision.  Stalinski Decl. Ex. B at 800–03 [638–41].  Dr. Bodenheimer stated, "there is no need for a fresh in vitro fertilization cycle . . . [as] [t]he patient might be able to complete her family with the 9 oocytes already preserved and therefore additional in vitro fertilization cycles are not medically necessary."  *Id.* at 801 [639].[9]

### ii.  Fertilization of the 2017 and 2021 Oocytes[10] by ICSI

Plaintiff also sought pre-authorization from the Plan for the fertilization of all thawed and retrieved oocytes using ICSI.  56.1 Stmt. ¶ 17.  Coverage was denied on October 27, 2021, and Plaintiff appealed.  Stalinski Decl. Ex. B at 1030–31 [869–70].  On December 5, 2021, Dr. Naughton upheld the denial of coverage because ICSI is not medically necessary in routine IVF cycles.  56.1 Stmt. ¶ 30.  On second level appeal, Dr. Palmer affirmed the denial of coverage for ISCI because it is not medically necessary.  *Id.* ¶ 35.

---

[8]     As discussed at pgs. 7–9, this requested review also included Oxford's refusal to cover fertilization by ICSI and PGT-A genetic testing.

[9]     Dr. Bodenheimer reiterated that conclusion on February 11, 2022.  *Id.* at 1190–94 [1029–33].

[10]    Plaintiff proceeded with the retrieval of oocytes in 2021 at her own expense.  56.1 Stmt. ¶ 87.

On December 17, 2021, Plaintiff appealed the denial of coverage for ICSI.  *Id*. ¶ 37.

Plaintiff argued that, according to her treating physician, her "[2017 oocytes] can only be

fertilized through the ICSI technique."  Stalinski Decl. Ex. B at 1161 [1000].  Oxford referred

Plaintiff's December 17, 2021, appeal to Medical Review Institute of America, LLC ("Medical

Review"), an independent peer reviewer, to conduct the review.  56.1 Stmt. ¶ 38.  On January 11,

2022, Medical Review concluded that "ICSI on cryopreserved oocytes is the preferred method

for achieving fertilization, although limited data currently exist to support this procedure."

Stalinski Decl. Ex. B at 1151 [990].  On January 13, 2022, Oxford then approved coverage for

ICSI.  56.1 Stmt.  ¶¶ 41–42.

Because, however, the issue of coverage for ICSI was also part of the package of

procedures that Plaintiff had submitted to IPRO for independent review on December 22, 2021,

IPRO also considered whether ICSI was medically necessary.  Stalinski Decl. Ex. B at 1190

[1029].  IPRO concluded on February 11, 2022, that "ICSI for [Plaintiff] is not indicated or

medically necessary."  *Id*. at 1192 [1031].  IPRO explained: "ICSI for unexplained infertility has

been associated with increased fertilization rates . . . but has not been shown to improve live-

birth outcomes."  *Id*.  IPRO's benefit determination is binding on Oxford and Plaintiff.  56.1

Stmt. ¶ 53.

### iii.  PGT-A Testing and Cryopreservation of Any Resulting Embryos

Finally, Plaintiff requested pre-authorization from the Plan for PGT-A testing of any

embryos that resulted after fertilization of the oocytes.  56.1 Stmt. ¶ 17.  On September 22, 2021,

Oxford denied coverage based on Oxford's Preimplantation Genetic Testing Policy.  Stalinski

Decl. Ex. B at 619 [456].  Plaintiff sought review of that decision on October 18, 2021.  56.1

Stmt. ¶ 23.  Dr. May upheld the decision to deny coverage for PGT-A testing because the

"genetic screening test is considered experimental"; the lack of medical necessity was determined based on Oxford's guidelines.  Stalinski Decl. Ex. B at 1030–31 [869–70].  On November 1, 2021, Dr. Spandorfer, Plaintiff's physician, asked Oxford to reconsider coverage for PGT-A testing.  *Id*. at 712 [549].  He argued that Plaintiff had "elected to utilize PGT-A because of her advanced maternal age."  *Id*.

On November 2, 2021, Dr. Naughton responded to Plaintiff's October 18, 2021 appeal and upheld denial of coverage for PGT-A testing.  56.1 Stmt. ¶ 27.  Dr. Naughton noted that embryo biopsy and genetic testing are "only medically necessary for couples who have a genetic condition or carry abnormal genes that could cause an illness in their child."  *Id*.  Because Plaintiff's medical records did not show such conditions, coverage was denied.  *Id*.

About a month later, Dr. Naughton also denied Dr. Spandorfer's appeal.  Stalinski Decl. Ex. B at 1200–01 [1039–40].  She reiterated her position that PGT-A testing is "only medically necessary for couples who have a genetic condition or carry abnormal genes that could cause an illness in their child" and that Plaintiff's "records do not show this."[11]  *Id*. at 1201 [1040].  Dr. Naughton observed that the "New York State Mandate was looked at again."  *Id*.

On a second level appeal, Dr. Palmer upheld the denial of coverage for PGT-A testing due to lack of medical necessity after again reviewing Plaintiff's medical records, the Plan, and the Mandate.  56.1 Stmt. ¶ 36; Stalinski Decl. Ex. B at 882 [720].  Plaintiff sought a voluntary external review.  Stalinski Decl. Ex. B at 1160–62 [999–1001].  The review was conducted by

---

[11]     Dr. Naughton's letter referenced Oxford's Preimplantation Genetic Testing Clinical Policy, which provides that PGT-A testing is appropriate if the embryo is "at increased risk of a recognized inherited disorder," and "the medical condition being prevented must result in significant health problems or severe disability and be caused by a single gene (PGT-M) or structural changes of a parents' chromosome (PGT-SR)."  56.1 Stmt. ¶ 32.  Dr. Spandorfer's appeal had noted that Plaintiff's first pregnancy was diagnosed with trisomy 21 (Down Syndrome), Stalinski Decl. Ex. B at 712 [549]; that is not inconsistent with Dr. Naughton's conclusion that Plaintiff's medical records do not show that she or her partner has a genetic condition or carry abnormal genes that could cause an illness in their child.  *Id*. at 1201 [1040].

Medical Review and concluded that "pre-implantation genetic testing is unproven and not medically necessary." *Id*. at 1151 [990].  That review further noted possible disadvantages of such testing, including false positives and possibly increased risk of miscarriage.  *Id*.

As was the case with ICSI, PGT-A testing was also an issue considered during the external review by IPRO.  IPRO concluded on January 27, 2022, that "there is no medical indication for PGT-A at this time" because Plaintiff "does not have any genetic anomaly and is not a carrier of a genetic condition or chromosomal anomaly known to cause the birth of a child with a genetic condition."  *Id*. at 802 [640]; *see also id*. at 1192 [1031].

### B.  Procedural History

Plaintiff commenced this action in New York Supreme Court against Oxford and IPRO, *see* Not. of Removal ¶ 1, Dkt. 1, and Defendants jointly removed the case to federal court on the grounds that Plaintiff's claims are preempted by ERISA, *see id.* ¶ 6.  Plaintiff's remand motion, Dkt. 15, was denied because ERISA entirely preempts Plaintiff's claims, *see* Oct. 7, 2022 Order, Dkt. 42.  Plaintiff filed an Amended Complaint on November 10, 2022.  *See* Dkt. 46.

After a motion to dismiss, *see* August 8, 2023 Opinion & Order, Dkt. 58, Plaintiff's sole surviving claim is for money damages for the alleged wrongful denial of benefits under ERISA Section 502(a)(1)(B).[12]  Oxford answered the Amended Complaint on August 18, 2023.  *See* Answer, Dkt. 60.  Thereafter, the parties filed cross-motions for summary judgment.[13]  *See* Oxford Mot., Dkt. 99, Kwasnik Mot., Dkt. 105.

---

[12]   Under ERISA Section 502(a)(1)(B), "[a] civil action may be brought . . . by a participant or beneficiary . . . to recover benefits due to h[er] under the terms of his plan, to enforce h[er] rights under the terms of the plan, or to clarify h[er] rights to future benefits under the terms of the plan."  29 U.S.C. § 1132(a)(1)(B).

[13]   The Court initially denied both motions for summary judgment without prejudice for failure to comply with Local Civil Rule 56.1(a) and the Undersigned's Individual Practices Rule 4(H)(ii).  *See* Dkts. 77, 82; Feb. 6, 2024 Order, Dkt. 98.  The parties had not coordinated their 56.1 Statements so that the Court had one, final consolidated 56.1 Statement, and the parties failed to cite to the 56.1 Statement in their briefs.  The parties re-wrote the 56.1 Statement and re-filed their motions.

## II.    DISCUSSION

### A.  Summary Judgment Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."  *Scott v. Harris,* 550 U.S. 372, 380 (2007) (internal quotation marks and citation omitted).  When parties cross-move for summary judgment, the Court analyzes the motions separately, "in each case construing the evidence in the light most favorable to the non-moving party."  *Wandering Dago Inc. v. Destito*, 879 F.3d 20, 30 (2d Cir. 2018) (citation omitted).  Although the Court must construe the facts in the light most favorable to the non-moving party, "a party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment."  *Fed. Trade Comm'n v. Moses*, 913 F.3d 297, 305 (2d Cir. 2019) (internal quotation marks and citation omitted).

### B.  Applicable Standard of Review

Under ERISA, courts review a denial of benefits *de novo* "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  If the benefit plan grants the administrator such discretion, courts ordinarily "will not disturb the administrator's ultimate conclusion unless it is arbitrary and capricious."  *Hobson v. Metro. Life Ins. Co.*, 574 F.3d 75, 82 (2d Cir. 2009) (internal quotation marks and citation omitted).  An administrator's decision will be overturned as "arbitrary and capricious" only when the decision is "without reason, unsupported by substantial evidence or erroneous as a matter of

law." *Roganti v. Metro. Life Ins. Co.*, 786 F.3d 201, 211 (2d Cir. 2015) (internal quotation marks and citation omitted).

There is an exception to the general rule. "[W]hen denying a claim for benefits, a plan's failure to comply with the Department of Labor's ["DOL"] claims-procedure regulation, 29 C.F.R. § 2560.503–1, will result in that claim being reviewed *de novo* in federal court, unless the plan has otherwise established procedures in full conformity with the regulation and can show that its failure to comply with the claims-procedure regulation in the processing of a particular claim was inadvertent *and* harmless." *Halo v. Yale Health Plan, Dir. of Benefits & Recs. Yale Univ.*, 819 F.3d 42, 57–58 (2d Cir. 2016). The Plan bears the burden of proof because "the party claiming deferential review should prove the predicate that justifies it." *Id*. at 58. District courts that have considered the issue, however, agree that a plaintiff must make an initial showing that the Plan violated the DOL's regulations before any burden shifts to the plan administrator. *See, e.g., Capretta v. Prudential Ins. Co. of Am.*, No. 16-cv-1929, 2017 WL 4012058, at *6 (S.D.N.Y. Aug. 28, 2017) ("Here, Plaintiff neither makes a showing that Defendant failed to maintain a reasonable claims procedures nor alleges how Defendant's claims procedure—or its application thereof—might have violated the regulations. Because Plaintiff has failed to make such a minimal showing, Defendant will not be required to prove affirmatively its regulatory compliance.").

The parties disagree as to the proper standard of review. Oxford argues the standard of review is the arbitrary and capricious standard while Plaintiff maintains that the Court should undertake a *de novo* review. The parties agree that the Plan delegates discretionary authority to Oxford to administer all claims for benefits under the Plan. Oxford Mem. at 13, Dkt. 101;

Kwasnik Opp. at 15, Dkt. 107.[14]   Plaintiff contends that the denial of her claim for IVF benefits should, nevertheless, be reviewed *de novo* because Oxford violated the DOL claims procedures, and the violations were neither inadvertent nor harmless.  Kwasnik Mem. at 9–16, Dkt. 105. Specifically, Plaintiff argues that Oxford: (1) failed to provide her with a copy of her claim file, records, and other information relevant to the claim for benefits in violation of 29 C.F.R. § 2560.503-1(h)(2)(iii); (2) failed to consider information she submitted in support of her appeal in violation of 29 C.F.R. § 2560.503-1(h)(2)(iv); and (3) improperly afforded deference to the initial adverse benefit determination in violation of 29 C.F.R. § 2560.503-1(h)(3)(ii).  *Id.*

### 1.   29 C.F.R. § 2560.503-1(h)(2)(iii)

DOL rules require ERISA plans to provide claimants, "upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits."  29 C.F.R. § 2560.503-1(h)(2)(iii).

Plaintiff asserts that she requested access to her claim file in one of her November 15, 2021, letters to Oxford and that Oxford only provided her with those materials after she commenced this litigation.  Kwasnik Mem. at 9.  As Oxford notes, Plaintiff's brief does not cite to her November 15, 2021, letter but instead cites to her December 22, 2021, letter; in that letter Plaintiff wrote, "[i]n order to better understand [Oxford's] reasoning, on November 15, 2021, I wrote to [Oxford] requesting reasonable access to and copies of all documentations, records, and other information relevant to my appeal. . . .  As of the date of this letter, I still have not received the requested information."  Stalinski Decl. Ex. B at 784 [622].  The administrative record

---

[14]       Specifically, the Plan provides, "[w]e may develop or adopt standards that describe in more detail when [w]e will or will not make payments under [the Plan] . . . We may also develop administrative rules pertaining to enrollment and other administrative matters.  We shall have all the powers necessary or appropriate to enable [u]s to carry our [o]ur duties in connection with the administration of this Certificate."  Plan at 120–21 [121–22].

contains only one letter from Plaintiff dated November 15, 2021, and that letter did not request access to Plaintiff's records. *Id*. at 772 [610].

Plaintiff concedes that the letter she is relying on for this argument is not in the administrative record, but she urges the Court to use its discretion to consider it anyway. Kwasnik Opp. at 2–3. The Court declines to do so. The Court has no evidence that there ever was a letter dated November 15, 2021, making such a request. Although Plaintiff argues that the reference in the December 22 letter "is *prima facie* evidence" that there was such a request, the Court disagrees. *See id*. Plaintiff knows how to make a motion to expand the administrative record, *see* Motion, Dkt. 71. The fact that she never moved to expand the record to include the letter she purportedly sent on November 15, 2021 seeking access to her claims file strongly suggests that there was no such letter.

Because there is no evidence in the record that Plaintiff ever requested her claim file, Plaintiff has not made an initial showing that Oxford violated this regulation.[15]

### 2. 29 C.F.R. § 2560.503-1(h)(2)(iv)

DOL Rules require an ERISA plan, when conducting a review of an adverse benefit determination, to take "into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination." 29 C.F.R. § 2560.503-1(h)(2)(iv). Plaintiff contends that Oxford failed to consider her policy, the Mandate,[16] and the Mandate's

---

[15]     Even if the Court were to view Plaintiff's December 22, 2021 letter as a request for her claim file and find that Oxford violated the DOL regulation and that the violation was not inadvertent or harmless so that a *de novo* review would be required, it would not alter the outcome of the case.

[16]     New York Insurance Law §§ 3221(k)(6)(C)(vii) and 4303(s)(3)(G) provide that:

    Every large group policy delivered or issued for delivery in this state that provides medical, major medical or similar comprehensive-type coverage shall provide coverage for three cycles of in-vitro fertilization used in the treatment of infertility. . . .  For purposes of this item, a "cycle" is defined as either all treatment that

applicability to her claims, as outlined in various letters she submitted to Oxford.  Kwasnik Mem. at 10.

When Oxford initially denied Plaintiff's request for coverage for an IVF cycle, the Plan stated that the procedure was not medically necessary because of the availability of Plaintiff's 2017 oocytes.  *See* Stalinski Decl. Ex. B at 618–19 [455–56].  That letter relied entirely on Oxford's internal guidelines and did not reference the Mandate.  *Id*.  Although Plaintiff acknowledges that Oxford's December 5 and 10, 2021, letters noted that the Mandate was "looked at," she maintains that Oxford based its decisions on its internal policies and did not consider the Mandate, in contravention of state law.  Kwasnik Mem. at 10.  *See also* Stalinski Decl. Ex. B at 876–78 [714–16], 881–83 [719–21].  She argues that there is no other evidence in the administrative record that Oxford "understood" or "g[ave] precedence [to the Mandate] over Oxford's internal guidelines."  Kwasnik Mem. at 11.  Plaintiff argues Oxford did not take into consideration the Mandate when considering her claim and, thus, violated 29 C.F.R. § 2560.503-1(h)(2)(iv).  *See id*. at 13.

Plaintiff has not met her initial burden to establish that Oxford violated this regulation. She asserts that it is "clear" that Oxford failed to consider the Mandate and apply it to her particular circumstances, Kwasnik Mem. at 10, even though she concedes that two of the letters Oxford sent specifically noted that the "New York State Mandate was looked at again," Stalinski Decl. Ex. B at 876–78 [714–16], 881–83 [719–21].  Additionally, the administrative record

---

starts when: preparatory medications are administered for ovarian stimulation for oocyte retrieval with the intent of undergoing in-vitro fertilization using a fresh embryo transfer; or medications are administered for endometrial preparation with the intent of undergoing in-vitro fertilization using a frozen embryo transfer.

N.Y. Ins. Law. §§ 3221(k)(6)(C)(vii), 4303(s)(3)(G).

contains other evidence that tends to show that Oxford considered both the Plan and the Mandate in its decision-making.  *See id*. at 700 [537], 882 [720], 1201 [1040].

Plaintiff argues that "a perfunctory acknowledgement" of the Mandate is not sufficient. Plaintiff relies on a Tenth Circuit case, *D.K. v. United Behav. Health*, 67 F.4th 1224, 1242 (10th Cir. 2023), in which that court held that the defendant's failure to cite any facts constituted conclusory reasoning, amounting to arbitrary and capricious conduct.  Oxford's denial letters are quite different from the benefit denials at issue in *D.K.*; Oxford's letters included the medical director's reasoning for each denial and the information on which the reviewer based his or her decision.  Oxford denied coverage for an IVF cycle, for ICSI, and for PGT-A testing because those services were not medically necessary and not because Plaintiff had exceeded the lifetime limit of three IVF cycles.  *See infra* Part II.C.  Given Oxford's rationale for denying coverage, it would have been nonsensical for Oxford to discuss the Mandate in its denial letters.  Contrary to Plaintiff's assertion, it is clear that Oxford considered both the Plan and the Mandate in connection with each level of her appeal.  The fact that Oxford was not persuaded by Plaintiff's submissions does not mean that it did not consider them.

In short, Plaintiff has not established that Oxford violated this regulation.

### 3.  29 C.F.R. § 2560.503-1(h)(3)(ii)

DOL regulations mandate an appeals process that "does not afford deference to the initial adverse benefit determination[s]."  29 C.F.R. § 2560.503-1(h)(3)(ii).  To that end, the review of the "initial adverse benefit determination" must be conducted by someone "who is neither the individual who made the adverse benefit determination that is the subject of the appeal, nor the subordinate of such individual."  *Israel v. Unum Life Ins. Co. of Am.*, No. 21-cv-4335, 2023 WL 491039, at *7 (S.D.N.Y. Jan. 27, 2023) (citing 29 C.F.R. § 2560.503-1(h)(3)(ii)).

Plaintiff argues that Dr. May authored the initial denial letter dated September 22, 2021 and the subsequent October 27, 2021 denial, thereby violating "the spirit of a full and fair review." Kwasnik Mem. at 14. Plaintiff is confusing the record. On September 22, 2021, Dr. May denied coverage for an IVF cycle because it was not medically necessary. Stalinski Decl. Ex. B at 618–19 [455–56]. On October 27, 2021, Dr. May denied coverage for PGT-A testing because genetic screening "is considered experimental." *Id*. at 1030-31 [869–70]. Those were two separate adverse benefit determinations; there is nothing in the record to suggest that Dr. May had any role in the appeal of either of those initial adverse benefit determinations. Similarly, there is no evidence that either appeal review was conducted by a subordinate of Dr. May.

Plaintiff also argues that Dr. Naughton, who authored the denial letters dated November 2, 2021 and December 5, 2021, violated the regulation. Kwasnik Mem. at 14. On November 2, 2021, Dr. Naughton upheld Oxford's initial decisions that neither an IVF cycle nor PGT-A testing was medically necessary. Stalinski Decl. Ex. B at 750–51 [588–89]. Separately, on December 5, 2021, Dr. Naughton responded to Dr. Spandorfer's November 1, 2021, letter requesting reconsideration of the decision to deny coverage for PGT-A testing. *Id*. at 1201 [1040]. On December 5, 2021, Dr. Naughton explained to Plaintiff that Oxford would cover the thawing of the 2017 oocytes and the freezing and transfer of embryos created through the fertilization of Plaintiff's frozen oocytes but affirmed the denial of coverage for PGT-A testing and for fertilization using ICSI. *Id*. As to the latter, Dr. Naughton indicated that method is "not needed in routine IVF cycles." *Id.* There is no evidence in the administrative record that Dr. Naughton was involved in the second level appeal of those decisions; nor is there evidence that either second level review was conducted by a subordinate of Dr. Naughton. Dr. Naughton's

December 5, 2021, letter to Plaintiff specifically states: "I had no previous involvement in the review of your case." *Id.*  Plaintiff argues that Dr. Naughton authored prior denials for an intrauterine insemination ("IUI") procedure, 56.1 Stmt. ¶ 150, but that denial was separate and distinct from her claim for an IVF cycle, ICSI, and PGT-A testing, which are the medical procedures that are at issue in this case, Stalinski Decl. Ex. B at 1936–37 [1779–80].  Nothing in the record suggests deference was given by any of the reviewers to the prior determinations.

Because Plaintiff has failed to demonstrate that Oxford violated any DOL regulation, she is not entitled to a *de novo* review.  Accordingly, the Court will review the decisions under an arbitrary and capricious standard in light of the discretionary authority provided to the Plan Administrator by the Plan. [17]

### C.  Oxford's Decision to Deny Coverage Was Not Arbitrary or Capricious

Plaintiff challenges Oxford's determinations that an IVF cycle, PGT-A testing, and fertilization by ICSI were not "medically necessary," arguing that Oxford failed to apply the Mandate.  Kwasnik Mem. at 17.  She also argues that Oxford's decisions were arbitrary and capricious because it disregarded material submitted by her and interpreted its guidelines in a way that was inconsistent with the plain language of the Policy.  *See id.* at 17, 21.

---

[17]    Plaintiff contends that IPRO's determination should not be considered unless the *de novo* standard is applied, arguing that a court's review is typically limited to the administrative record that was before the plan administrator when it made its benefit determination.  Kwasnik Opp. at 7 (citing *Hughes v. Hartford Life & Accident Ins. Co.*, 507 F. Supp. 3d 384, 389 (D. Conn. 2020)).  The Second Circuit has held that district courts are imbued with discretion to admit additional evidence where "good cause" exists.  *Halo*, 819 F.3d at 60 (citing *DeFelice v. Am. Int'l Life Assurance Co.*, 112 F.3d 61, 66–67 (2d Cir. 1997)).

Plaintiff initiated an external appeal with the New York State DFS, which assigned IPRO to review her case.  56.1 Stmt. ¶¶ 15, 176.  Because the parties agree that, under the Plan, the external appeal agent's decision is "binding on both [the plan member] and [Oxford]," and because IPRO's determinations are part of the administrative record, the Court finds sufficient "good cause" to consider IPRO's determinations.  *Id.* ¶ 16.  That said, except on the issue of ICSI, the Court would reach the same conclusion regardless of the IPRO.  As to ICSI, Plaintiff elected to seek external review and, by doing so, she lost the benefit of Oxford's decision-making that post-dated review by Medical Review.  Had she not done so, Oxford would have covered fertilization by ICSI.

The arbitrary and capricious standard is a highly deferential standard of review. *Preville v. PepsiCo Hourly Emps. Ret. Plan*, 649 F. App'x 63, 64 (2d Cir. 2016); *see also Halo*, 819 F.3d at 56 (noting the "great deference afforded by the arbitrary and capricious standard"). "In the ERISA context, an administrator's decision is arbitrary and capricious if it is made without reason," or "is unsupported by substantial evidence." *Arnone v. Aetna Life Ins. Co.*, 860 F.3d 97, 105 (2d Cir. 2017) (citation omitted). Substantial evidence is evidence that a reasonable person would accept as adequate to support the conclusion reached; it requires "more than a scintilla but less than a preponderance." *Durakovic v. Bldg. Serv. 32 BJ Pension Fund*, 609 F.3d 133, 141 (2d Cir. 2010) (citation omitted). Under this deferential standard of review, courts "are not free to substitute [their] own judgment for that of [the administrator] as if [they] were considering the issue of eligibility anew." *Hobson*, 574 F.3d at 83–84 (citation omitted). Even when a claimant offers a rational interpretation of plan provisions, "the administrator's interpretation must be allowed to control." *McCauley v. First Unum Life Ins. Co*, 551 F.3d 126, 132 (2d Cir. 2008) (citation omitted).

Oxford contends that its benefit determinations were far from arbitrary and capricious. They were "reasonably based on numerous items of substantial evidence in the administrative record, including the opinions of four separate Oxford Medical Directors and underscored by an independent external review physician." Oxford Mem. at 15. Oxford's infertility guidelines, which are incorporated into the Plan, provide that "[f]resh oocyte retrievals are not indicated when previously frozen oocytes . . . are available for transfer." Stalinski Decl. Ex. B at 283 [117]. Dr. May's initial adverse benefit determination and Dr. Naughton's first level appeal both stated that a fresh IVF cycle was not medically necessary given the availability of Plaintiff's 2017 oocytes. *Id*. at 618–19 [455–56], 750–51 [588–89]. Thereafter, Dr. Palmer's second level

appeal upheld the denial of coverage for a fresh IVF cycle because it was not medically necessary; Plaintiff had "eggs that were frozen in or around 2017" and Oxford did not possess "information showing that the thawed egg/embryos were used prior to IVF being done." *Id*. at 881–82 [719–20]. Dr. Bodenheimer, who conducted the voluntary external review for IPRO, also upheld the denial of coverage, noting that nine previously frozen oocytes existed and observing that the eggs Plaintiff froze when she was age 37 are considered better quality than any that would be recovered at age 42. *Id*. at 801 [639]. Dr. Bodenheimer also noted that if the thawing and fertilization of the 2017 oocytes did not result in a live birth, an IVF cycle would then be covered. *Id*.

Oxford's determinations to deny coverage of fertilization by ICSI and for PGT-A testing were also based on substantial evidence and were not arbitrary or capricious. The Plan states that PGT-A testing is "unproven and not medically necessary . . . due to insufficient evidence of efficacy," unless the embryo is "at increased risk of a recognized inherited disorder" and "[a]t least one parent is a carrier of an autosomal dominant, sex-linked, or mitochondrial condition" or "of a balanced structural chromosome rearrangement." *Id*. at 1340 [1180]. Dr. Naughton's first level appeal upheld the denial of coverage for PGT-A testing, because Plaintiff's medical records did not show that Plaintiff or her partner had "a genetic condition" or carried "abnormal genes that could cause an illness in their child." *Id*. at 1201 [1040]. In addition, Dr. Naughton denied coverage for fertilization of the 2017 oocytes by ICSI because that method "is not needed in routine IVF cycles" and, as such, was not medically necessary. *Id*. On second level appeal, Dr. Palmer upheld the prior denials, finding again that fertilization by ICSI "is not approved in routine IVF cycles" and that PGT-A testing was not medically necessary because there was no evidence that Plaintiff or her partner had a genetic condition or abnormal genes. *Id*. at 882 [720].

At the independent review level, Dr. Bodenheimer upheld the denial of coverage for PGT-A testing, noting that it is "not indicated for advanced maternal age or recurrent pregnancy loss or for recurrent implantation failures." *Id*. at 802 [640].  Dr. Bodenheimer also upheld the denial of coverage for fertilization by ICSI, concluding that "ICSI for low oocyte yield and advanced maternal age does not improve live-birth outcomes," and Plaintiff's partner's sperm "is reported to be normal," making ICSI not medically necessary. *Id*. at 1192 [1031].  Although Oxford had reversed its earlier decision regarding fertilization by ICSI based on a report from Medical Review, *id*. at 2859–60 [2707–08], Oxford contends that Dr. Bodenheimer's February 11, 2022, which concluded that ICSI was not medically necessary, is the "binding" decision, *id*. at 1192 [1031].  Oxford Mem. at 18.

Plaintiff argues that Oxford's decision-making was arbitrary and capricious because it failed to consider and apply the Mandate to her case.  Kwasnik Mem. at 17.  Plaintiff is not correct.  The Plan complies with the Mandate, as it clearly provides coverage, when medically necessary, for "[t]hree (3) cycles per lifetime of in vitro fertilization" along with "[c]ryopreservation and storage of embryos in connection with in vitro fertilization."  Plan at 69.  The Plan also defines a "cycle" as "all treatment that starts when: preparatory medications are administered for ovarian stimulation for oocyte retrieval with the intent of undergoing in vitro fertilization using a fresh embryo transfer, or medications are administered for endometrial preparation with the intent of undergoing in vitro fertilization using a frozen embryo transfer," which is consistent with the statutory language of the Mandate.  *Id*.; N.Y. Ins. Law §§ 3221(k)(6)(C)(vii), 4303(s)(3)(G).  IPRO's external appeal even acknowledged that Plaintiff would be eligible for additional IVF cycles if none of the previously-frozen oocytes, after thawing and fertilization, resulted in a live birth.  Stalinski Decl. Ex. B at 801 [639].

Plaintiff's argument that the Mandate prohibits Plans from considering IVF services obtained prior to 2020, Kwasnik Mem. at 11, reflects a misunderstanding of the Mandate. The Mandate excludes from the law's limit of three IVF cycles per lifetime any IVF services obtained prior to 2020. Stalinski Decl. Ex. B at 3078 [2927]. The flaw in Plaintiff's argument is that Oxford did not "count" Plaintiff's 2017 oocytes as a prior cycle for purposes of the three-cycle limit; it denied her claim for an IVF cycle because the existence of the 2017 oocytes meant a fresh IVF cycle was not medically necessary. Under New York law, including the Mandate, insurers are permitted to review requests for IVF services for medical necessity. *Id*. The Plan only covers services that are "Medically Necessary," and Oxford's review of medical necessity can be based on its "medical policies and clinical guidelines." Plan at 46–47. The Plan delegates discretionary authority to Oxford to "develop or adopt standards" or "administrative rules" for coverage. *Id*. at 120–21. Because Oxford's internal guidelines provide that additional IVF cycles are not medically necessary when previously-frozen oocytes are available for fertilization and transfer, Oxford reasonably denied coverage for an IVF cycle. That decision was entirely consistent with the Mandate and the Plan.

Next, Plaintiff argues that Oxford's reliance on and application of its internal guidelines was erroneous. Kwasnik Mem. at 17. Plaintiff contends that Oxford's decision contravenes the plain language of the Policy, which requires Oxford to cover three cycles of IVF for women who have been diagnosed with infertility. *Id*. at 18. Plaintiff takes issue with Oxford's conclusion that her 2017 oocytes were "available;" Plaintiff argues that she paid for the retrieval of the 2017 oocytes and they were, therefore, "her" property. Kwasnik Opp. at 9–10. Plaintiff also asserts that Oxford inconsistently applied its guidelines and ignored her treating physician's recommendation when it denied coverage for PGT-A. Kwasnik Mem. at 21. Plaintiff also

quarrels with Oxford's initial determination that fertilization by ICSI was not medically necessary because Oxford's internal guidelines state that ICSI is indicated when using previously frozen oocytes. *Id.* (citing Stalinski Decl. Ex. B at 967 [806]).  Oxford initially denied coverage for the thawing, storage, and transfer of any embryos created from the 2017 oocytes and then reversed course and approved these services; Plaintiff argues that change of position demonstrates that Oxford applied its guidelines inconsistently. *Id.* at 22.

The Court is not persuaded by Plaintiff's arguments.  Contrary to Plaintiff's assertion, there is no evidence in the record that Oxford ignored the recommendations of Plaintiff's doctor. The Oxford Medical Director reviewed Plaintiff's "clinical information," Stalinski Decl. Ex. B at 618 [455], 744 [582], and Dr. Ryan, an Oxford Medical Director, conducted a peer-to-peer call with Dr. Spandorfer, Plaintiff's treating physician, 56.1 Stmt. ¶ 21.  The evidence does not support Plaintiff's argument that Oxford disregarded Dr. Spandorfer's recommendations. Instead, the evidence shows that Oxford communicated with Plaintiff's doctor and had multiple other physicians assess Plaintiff's clinical information; Oxford's doctors reached a different decision regarding medical necessity.  Oxford was not required to defer to Plaintiff's treating doctor regarding medical necessity.[18] *See Gannon v. Aetna Life Ins. Co.*, No. 05-cv-2160, 2007 WL 2844869, *13 (S.D.N.Y. Sept. 28, 2007) (the insurance company "was not required to defer to the opinion of the plaintiff's psychiatrist"); *Black & Decker Disability Plan v. Nord*, 538 U.S.

---

[18]     Oxford's denial of coverage for PGT-A testing was also not arbitrary and capricious.  Plaintiff argues that Oxford gave no consideration to Dr. Spandorfer's treatment plan regarding genetic testing.  Dr. Spandorfer stated in his November 1, 2021, appeal: "[Plaintiff] elected to utilize PGT-A because of her advanced maternal age." Stalinski Decl. Ex. B at 2011 [1855].  Oxford did not ignore Dr. Spandorfer's opinion; that doctor himself characterized the desire for genetic testing as the Plaintiff's desire.  Plaintiff is not correct that Oxford inconsistently interpreted its guidelines by denying PGT-A testing even though the "availability" of the oocytes is predicated on their genetic condition.  Oxford denied coverage for PGT-A testing for embryos not oocytes.  Oxford's guidelines provide that fresh IVF cycles are not indicated "when previously frozen oocytes (M2) or embryos of at least BB grading quality (or equivalent) are available for transfer and if tested, are genetically normal." *Id.* at 283 [117]. Nothing in the administrative record states that the 2017 oocytes were genetically tested or that such tests determined them to be genetically abnormal.

822, 825 (2003) ("plan administrators are not obliged to accord special deference to the opinions of treating physicians"); *Tortora v. SBC Commc'ns, Inc.*, 446 F. App'x 335, 338–39 (2d Cir. 2011) ("It is well settled that, in denying a claim for benefits under ERISA, the plan administrator may rely on the opinion of independent medical reviewers who have not conducted an examination of the applicant, even where the reviewer's opinion conflicts with that of the treating physicians") (citation omitted).

Plaintiff's argument that Oxford's internal guidelines are at odds with the Plan is not convincing.  Plaintiff insists that Oxford was required to cover the requested fresh IVF cycle in 2021 because the Plan requires coverage for three IVF cycles per lifetime.  Kwasnik Mem. at 18. It bears repeating that Oxford's denial had nothing to do with the three-cycle limit.  Her claim for coverage was denied because it was not medically necessary given that Plaintiff had the 2017 oocytes available to use.  As Dr. Bodenheimer stated in his January 27, 2022 letter, "[t]he aim of fertility treatment is to get pregnant and not to collect eggs or embryos. [Plaintiff] might be able to complete her family with the 9 oocytes already preserved and therefore additional [IVF] cycles are not medically necessary at this time."  Stalinski Decl. Ex. B at 801 [639].  The letter goes on to explain that Plaintiff would be eligible for IVF cycles (up to the three covered by the Plan and mandated by New York law) if none of the existing frozen oocytes results in a live birth after fertilization.  *Id*.  In short, although it is true that the Mandate prevents Oxford from "counting" the cycle Plaintiff paid for in 2017 as part of the mandate to cover three IVF cycles, 56.1 Stmt. ¶ 67, that has nothing to do with why Oxford denied coverage for an IVF cycle.

Plaintiff cites an out of circuit case, *Egert v. Conn. Gen. Life Ins. Co.*, for the proposition that an insurance company "cannot adopt *any* guidelines they choose and then rely upon these guidelines with impunity," but "may rely only upon those guidelines that reasonably interpret

their plans."  900 F.2d 1032, 1036 (7th Cir. 1990).  *Egert* is inapposite and easily distinguished

from the case at hand.  In that case, the Seventh Circuit held that the denial of the plaintiff's

claim for IVF services was arbitrary and capricious; the policy at issue required all claims for

IVF treatment to be denied as not medically necessary but it covered treatment for "illness" and

defined infertility as an "illness."  *Id*. at 1036.  The Plan at issue here, in contrast, expressly

covers "Advanced Infertility Services" but only such services as are medically necessary.  Plan

at 69.  Oxford's guidelines and common sense provide that "[f]resh oocyte retrievals are not

indicated when previously frozen oocytes (M2) or embryos . . . are available for transfer;" that

concept is in no way inconsistent with the plain language of the Plan.  Stalinski Decl. Ex. B at

283 [117].

The Court is also not swayed by Plaintiff's contention that Oxford's interpretation of

what constitutes an "available" oocyte was erroneous.  Because the Plan only covers "fertility

preservation services when a medical treatment will directly or indirectly lead to iatrogenic

infertility," Plan at 69 [70], Plaintiff argues that the only logical way for Oxford to consider her

2017 oocytes as "available" for use would be if the oocytes had been retrieved at Oxford's

expense as a covered service due to iatrogenic infertility.  Kwasnik Mem. at 18.  Any ambiguity

as to the meaning of "available," she argues, must be resolved in her favor.  *Id*. at 20.

Plaintiff's argument is inane.  As Oxford points out, nowhere within the Plan does it state

that "available" only refers to oocytes that were frozen due to iatrogenic disease.  Oxford Opp. at

16, Dkt. 106.  The Plan expressly states that Oxford can base its medical necessity review on a

claimant's "medical records;" it does not confine the review of records to those created during

the period of coverage.  Plan at 47.  Indeed, such a limitation would be absurd.  Even if Plaintiff

could point to an ambiguous provision in the Plan, it would not render Oxford's decision

arbitrary and capricious.  *See Houston v. Teamsters Loc. 210, Affiliated Health & Ins. Fund-Vacation Fringe Ben. Fund*, 27 F. Supp. 3d 346, 355 n. 5 (E.D.N.Y. 2014) ("even if [the term at issue] was ambiguous, such ambiguity does not create a genuine issue for trial because there is no evidence to support a finding that defendants' interpretation was arbitrary and capricious"). There is also no merit to Plaintiff's argument that Oxford used its guidelines to discriminate on the basis of Plaintiff's health condition or personal characteristics (*i.e.*, the existence of her 2017 oocytes) to deny her coverage.  Kwasnik Mem. at 12.  Oxford's guideline that bars fresh IVF cycles when frozen oocytes are available is indifferent to a claimant's health conditions, personal characteristics, and the source of financing for the frozen oocytes.  Nor is the existence of the 2017 oocytes considered a personal characteristic, as the New York State DFS defines "personal characteristics" as "age, sex, sexual orientation, marital status, or gender identity."  Stalinski Decl. Ex. B at 3078 [2927].  Finally, the difference of opinion on the medical necessity vel non of fertilization by ICSI does not demonstrate that Oxford's decisions were arbitrary and capricious.  At best it indicates that reasonable minds can differ on whether ICSI was indicated.

### D.  Oxford's Full and Fair Review

Finally, Plaintiff contends that Oxford's adverse benefit determination was influenced by a conflict of interest, thereby denying her a full and fair review.  Kwasnik Mem. at 22–23.  The Supreme Court has held that an ERISA administrator that "both evaluates claims for benefits and pays benefits claims" is conflicted, and that a district court, when reviewing the conflicted administrator's decisions, should weigh the conflict as a factor in its analysis.  *Metro. Life Ins. Co. v. Glenn,* 554 U.S. 105, 112 (2008).  "No weight is given to a conflict in the absence of any evidence that the conflict actually affected the administrator's decision."  *Durakovic*, 609 F.3d at 140 (citing *Hobson*, 574 F.3d at 83).

Plaintiff argues that Oxford's appeals process was problematic by having several of the same claim-administrators repeatedly review Plaintiff's claims, sanctioning their prior determinations. Kwasnik Mem. at 22. Factually, that is not correct. Dr. May denied coverage for a new IVF cycle on September 22, 2021 and PGT-A testing on October 27, 2021. Stalinski Decl. Ex. B at 618–21 [455–58], 1030–33 [869–72]. Dr. Naughton denied coverage for a new IVF cycle on November 2, 2021, and fertilization of the 2017 oocytes by ICSI and PGT-A testing on December 5, 2021, and was involved in other prior adverse determinations against Plaintiff for artificial insemination services. *Id*. at 750–54 [588–92], 1200–05 [1039–44]. Plaintiff also argues that Oxford's "self-serving review process" amounted to "rubber-stamped prior determinations" and that basing its decision on the "availability" of her 2017 oocytes only benefited Oxford's cost containment efforts. Kwasnik Mem. at 23.

The Court accords no weight to this factor, as Plaintiff failed to proffer any evidence "that the conflict actually affected the administrator's decision." *Durakovic*, 609 F.3d at 140 (citation omitted). As discussed *supra* in Part II.B.3, the evidentiary record lacks evidence that a conflict of interest affected any of Oxford's decisions to deny coverage. Dr. May denied coverage for a new IVF cycle and PGT-A testing, and there is no evidence that she was involved in the appeal review of either decision; nor is there evidence that either appeal review was conducted by a subordinate of Dr. May. There is also no evidence that Dr. Naughton was involved in the second level appeal review of her determinations to uphold denial of coverage for an IVF cycle, fertilization by ICSI, and PGT-A testing; nor is there evidence that any second level appeal was conducted by a subordinate of Dr. Naughton. Moreover, Oxford does not compensate or provide financial incentives to its employees or reviewers for deciding that requested services are not medically necessary. Plan at 95.

In short, the record does not support Plaintiff's argument that Oxford was influenced by a conflict of interest or that Oxford acted in an arbitrary or capricious manner when it determined that Plaintiff's claims for various services were not "medically necessary."  Oxford afforded Plaintiff a full and fair review and based its determination on substantial objective medical evidence.  There is no genuine issue of material fact that Oxford provided Plaintiff a full and fair review of its decisions.

## III.    CONCLUSION

For the foregoing reasons, Oxford's Motion for Summary Judgment is GRANTED, and Plaintiff's Motion is DENIED.  The Clerk of Court is respectfully directed to close the open motions at docket entries 99 and 105, and to terminate the case.

**SO ORDERED.**

**Date:  June 17, 2024**
**New York, New York**

_____
**VALERIE CAPRONI**
**United States District Judge**